UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SAYTON WALLER,
      Petitioner,

v.                          Case No. 3:20-cv-619-MMH-PDB

SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,
      Respondents.
_____

## ORDER

### I. Status

Petitioner Sayton Waller, an inmate of the Florida penal system, initiated this action on June 12, 2020,[1] by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Petition; Doc. 1).[2] In the Petition, Waller challenges a 2015 state court (Duval County, Florida) judgment of conviction for murder in the first degree, attempted murder in the first degree, and shooting or throwing deadly missiles. He raises four grounds for relief. See Petition at 8-38. Respondents submitted a memorandum in opposition to the Petition. See Response to Petition for Writ of Habeas Corpus filed March 26, 2021. (Response; Doc. 5). They also submitted exhibits. See Docs. 5-1 through

---

[1] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

[2] For purposes of reference to the pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

5-3. Waller filed a brief in reply. <u>See</u> Reply filed June 24, 2021. (Reply; Doc. 8). Waller's Petition is ripe for review.

## II. Relevant Procedural History

On November 13, 2013, the State of Florida charged Waller by information with murder in the second degree (count one) and attempted murder in the second degree (counts two and three). Doc. 5-1 at 44-45. On January 16, 2014, the State charged Waller by superceding indictment with murder in the first degree (count one), attempted murder in the first degree (count two), and shooting or throwing deadly missiles (count three). <u>Id.</u> at 71-73. Waller proceeded to a trial on counts one through three, and on April 30, 2015, a jury found him guilty on all counts. <u>Id.</u> at 187-91. On June 2, 2015, the trial court sentenced Waller to concurrent terms of life in prison for counts one and two and fifteen years in prison for count three. <u>Id.</u> at 203-09.

Waller appealed his convictions and sentences to Florida's First District Court of Appeal (First DCA). On direct appeal, Waller, with the benefit of counsel, filed an initial brief in which he argued that the trial court erred by instructing the jury on the principals theory (ground one) and by excluding evidence that one of the victims and Waller's co-defendant were members of rival gangs (ground two). Doc. 5-2 at 339-89. The state filed an answer brief. Doc. 5-2 at 391-418. Waller filed a reply brief. Doc. 5-2 at 420-30. The First DCA per curiam affirmed Waller's convictions and sentences without a written

2

opinion on November 15, 2016, Doc. 5-2 at 432, and issued the mandate on December 1, 2016, id. at 433.

On July 9, 2018, Waller filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. See Rule 3.850 Motion. Doc. 5-2 at 532-621. In his Rule 3.850 Motion, Waller alleged that trial counsel was ineffective for failing to call witnesses (grounds one and two) and failing to request jury instructions on justifiable and excusable attempted homicide (ground three). The postconviction court denied Waller's Rule 3.850 Motion on December 13, 2018. Doc. 5-2 at 622-1677; Doc. 5-3 at 1-143. The First DCA per curiam affirmed the denial of relief without a written opinion on February 13, 2020, Doc. 5-3 at 204-05, and issued the mandate on April 27, 2020, id. at 206.

### III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

### IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v.

3

<u>Landrigan</u>, 550 U.S. 465, 474 (2007); <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Schriro,</u> 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Waller's] claim[s] without further factual development," <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

### V. Governing Legal Principles

### A. Standard of Review

The AEDPA governs a state prisoner's federal petition for habeas corpus. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert</u>. <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" <u>Id.</u> (quoting <u>Hill v. Humphrey</u>, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. <u>See</u> <u>Marshall v. Sec'y,</u>

4

<u>Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

<u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. <u>Id.</u> at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Richter</u>, 562 U.S. at 97-98.

The Eleventh Circuit describes the limited scope of federal review pursuant to

§ 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different

6

> conclusion in the first instance.'"[3] <u>Titlow</u>, 571 U.S. at
> ---, 134 S. Ct. at 15 (quoting <u>Wood v. Allen</u>, 558 U.S.
> 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

<u>Tharpe v. Warden</u>, 834 F.3d 1323, 1337 (11th Cir. 2016), <u>cert</u>. <u>denied</u>, 137 S. Ct. 2298 (2017). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" <u>Tharpe</u>, 834 F.3d at 1338 (quoting <u>Richter</u>, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. <u>Richter</u>, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

---

[3] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." <u>Clark v. Att'y Gen., Fla.</u>, 821 F.3d 1270, 1286 n.3 (11th Cir. 2016), <u>cert</u>. <u>denied</u>, 137 S. Ct. 1103 (2017).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights."" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

8

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[4] <u>supra</u>, at 747–748, 111 S. Ct. 2546; <u>Sykes</u>,[5] <u>supra</u>, at 84–85, 97 S. Ct. 2497.  A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

---

[4] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).
[5] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[6] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally

---

   6 Murray v. Carrier, 477 U.S. 478 (1986).

> defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per

curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [<u>Strickland</u>,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. <u>Id.</u>, at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>, at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687, 104 S. Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243,

1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, - U.S. at -, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, - U.S. at -, 131 S. Ct. at 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference--this one to a state court's decision--when we are considering whether to grant federal habeas relief from a state court's

13

decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

### 1. Subclaim A

Waller contends that trial counsel was ineffective for not calling Torrence Hayes to testify that co-defendant Herode Joseph admitted to the offenses. Waller states that he and Joseph, who were both present at the time of the offenses, went to Hayes's house later that night. Waller asserts that Hayes would have testified that Waller was angry at Joseph for involving him and that Joseph confessed and apologized to Waller but stated that he "had to do it before" Liston Georges, the attempted murder victim, "got him." Petition at 29. Waller supported his claim in the postconviction court with an affidavit from Hayes. Doc. 5-2 at 562-63. In the affidavit, Hayes stated that he heard Joseph say that "I had to shoot him before he got me!" and that Joseph stated he shot Georges in retaliation for an earlier shooting. <u>Id.</u>

The state court denied Waller's ineffective assistance claim:

> Here, the record refutes Defendant's claim that counsel was ineffective for failing to call Hayes as a witness. Defendant alleges he asked counsel to investigate Hayes prior to trial, and counsel did not sufficiently attempt to acquire Hayes as a witness. Prior to Defendant's testimony, this Court questioned Defendant under

14

oath about his counsel's performance and additional witnesses for
the defense:

| | |
|---|---|
| Trial Court: | Any other witnesses that you wanted your counsel to call on your behalf? |
| Defendant: | No, ma'am. |
| Trial Court: | I'm sorry? |
| Defendant: | No, ma'am. |
| Trial Court: | Okay. Are you satisfied with the defense that has been presented for you up to this point? |
| Defendant: | Yes, ma'am. |

Defendant had an awareness of counsel's alleged deficient
performance when this Court engaged in the above colloquy, yet
Defendant still expressed satisfaction with counsel's performance.
He may not use his claims in the Motion to go behind his
representations to this Court. Accordingly, this Court denies
Ground One.

Id. at 624 (state court's record citation omitted).

To the extent that the First DCA decided the claim on the merits, the

Court will address the claim in accordance with the deferential standard for

federal court review of state court adjudications. After a review of the record

and the applicable law, the Court concludes that the state court's adjudication

of this claim was not contrary to clearly established federal law, did not involve

an unreasonable application of clearly established federal law, and was not

based on an unreasonable determination of the facts in light of the evidence

15

presented in the state court proceedings. Thus, Waller is not entitled to relief on the basis of this claim.

Nevertheless, even if the state appellate court's adjudication of the claim is not entitled to deference, Waller's claim is without merit. He has not shown that counsel was ineffective for not calling Hayes. Waller asserts that he asked counsel about Hayes before trial but counsel told him Hayes was unavailable. Waller points out that earlier in the colloquy cited by the postconviction court, he did indicate that he wanted his attorney to call unavailable witnesses. But the record shows that the witness in question was Liston Georges. The state court asked Waller about his decision to testify, and about calling any other witnesses:

> THE COURT: Do you - - let me ask you this. So far the State has presented their case. You have presented all of your witnesses. And you're going to be your final witness.
>
> Is that correct, [counsel?]
>
> [COUNSEL]: That's correct.
>
> THE COURT: You will be your final witness. Do you understand that?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Are you agreeable with the strategy so far your counsel has, evidence for your trial and presented here in court?
>
> THE DEFENDANT: Repeat that.

THE COURT: Are you satisfied with the defense that they are putting forth for you and the case they put on for you with your four witnesses before you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are there any other witnesses you wanted them to call on your behalf?

THE DEFENDANT: Yes. But they are unavailable.

[COUNSEL]: He's referring to the victim, Mr. Liston Georges.

THE COURT: Okay.

[COUNSEL]: I think Mr. Georges is in St. Thomas.

THE COURT: Okay.

[COUNSEL]: Is that correct?

THE COURT: The information that is going to be elicited from Mr. Georges has that been elicited through other witnesses[?]

[COUNSEL]: I think most of it probably. I'm not sure what additional information he wanted from him.

THE COURT: Mr. Waller, the information that was going to be elicited from Mr. Georges has been elicited. He said the shooter was shorter than six foot or under six foot and that they were thin build. Is that the information you wanted elicited from him?[7]

THE DEFENDANT: No, Your Honor. The fact that he said me and him never - - we didn't beef.

Doc. 5-1 at 1138-40.

---

[7] The trial court appears to have referred to Detective Tracy Stapp's testimony that Georges said the shooter was thin and was not taller than six feet. Doc. 5-1 at 1080.

Waller then stated that there were no other witnesses he wanted counsel to call and that he was satisfied with the defense up to that point. Id. at 1141. Waller asserts that he told counsel about Hayes before trial. Petition at 29. Thus, at the time of this colloquy with the trial court, both Waller and counsel were aware that the decision not to call other witnesses included Hayes. Waller's sworn[8] statements to the trial court are presumed to be truthful. Cf. Blackledge v. Allison, 431 U.S. 63, 73-74 (1977) (stating in the context of a plea colloquy that a defendant's representations "constitute a formidable barrier in any subsequent collateral proceedings" and that "[s]olemn declarations in open court carry a strong presumption of verity").

Waller has not shown that counsel was ineffective under these circumstances. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Knight v. Fla. Dep't of Corr., 936 F.3d 1322, 1340 (11th Cir. 2019) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995)). Counsel's strategic decisions "are entitled to a 'strong presumption' of reasonableness." Dunn v. Reeves, 141 S.Ct. 2405, 2410 (2021) (quoting Richter, 562 U.S. at 104).

And because Waller agreed with the strategic decision not to call other witnesses, he cannot prevail on a claim that counsel was ineffective for

---

[8] Before beginning the colloquy, the trial court reminded Waller that he was already under oath. Doc. 5-1 at 1135-36.

following this agreed-upon tactic. See Hammond v. Hall, 586 F.3d 1289, 1327-28 (11th Cir. 2009) (collecting cases standing for the proposition that a strategic decision by defense counsel does not amount to ineffective assistance under Strickland when the defendant agrees with the decision); Acuna v. United States, 494 F. App'x 961, 962-63 (11th Cir. 2012) ("This Court has stated that ineffective assistance does not exist under Strickland where the defendant ultimately concurred in his counsel's tactical decision or strategy. . . . Acuna essentially waived his right to contest his counsel's ineffectiveness [for not calling certain witnesses] by agreeing with that choice at trial.").

In his reply, Waller notes when the trial court asked whether he wanted any other witnesses called, he said that he did but that "they" were unavailable. See Reply at 4; Doc. 5-1 at 1139. Waller argues his use of the word "they" shows that he was referring to multiple prospective witnesses, not just Georges. But Waller did not correct counsel's representation to the trial court that the only prospective witness was Georges or express any desire to call Hayes. Doc. 5-1 at 1139-41. Rather, he explained to the trial court what he believed Georges would have said if called to testify and then stated that there was no one else he wanted to call. Id. at 1140-41.

Waller next states in his reply that later in the trial, after closing arguments, he addressed "a couple issues with [his] defense" with the trial

19

court and said that he had wanted counsel to subpoena Hayes. Doc. 15-2 at 113-14. Counsel explained that he tried to contact Hayes through his employer and also through Waller's mother but that Hayes never responded. Id. at 117-18. Counsel stated, "To this day, [Hayes has] never contacted me. And I explained that to Mr. Waller. I said, this guy is dodging me. He's been dodging me for over a year, and I never got a chance to talk with him." Id. at 118.

Waller's statement that he wanted counsel to subpoena Hayes, made after closing arguments, is not sufficient to find that counsel was ineffective. As the trial court noted when finding Waller's later statement disingenuous, this statement was wholly inconsistent with Waller's earlier sworn representations that there were no other witnesses he wanted counsel to call and that he approved of the defense counsel had presented. Doc. 15-1 at 1139-41; Doc. 15-2 at 122-24. When Waller had an opportunity to tell the trial court that he wanted counsel to call Hayes, he instead expressed his satisfaction with the defense and stated that he did not want other witnesses to be called. Doc. 5-1 at 1141. Waller has not shown ineffective assistance of counsel based upon this later inconsistent statement to the trial court.

Finally, in his reply, Waller contends that he only agreed with counsel's strategy because counsel lied to him about Hayes's availability. He cites Hayes's affidavit, in which Hayes stated he called the Office of the Public Defender and left a message, but that no one returned his call. Doc. 5-2 at 563.

20

But Waller does not account for why he did not specifically tell the trial court about Hayes. Again, when the trial court asked if he wanted to call "any other witnesses," instead of mentioning Hayes, Waller confirmed that he did not want any other witnesses called. Doc. 5-1 at 1141. His current assertions are insufficient to overcome the presumption that this sworn statement to the trial court was true. See, e.g., Blackledge, 431 U.S. at 73-74.

Waller has failed to show deficient performance of counsel under Strickland for not calling Hayes. He is not entitled to relief on Ground One, Subclaim A.

### 2. Subclaim B

Waller argues that trial counsel was ineffective for failing to call Detective Overholser as a witness. He states that Detective Overholser investigated an August 26, 2013 incident in which Herode Joseph was shot in the foot. Waller asserts that Detective Overholser could have testified that Joseph was a specific target in that incident and that Liston Georges was identified as a suspect. Waller contends that this testimony would have contradicted Joseph's testimony that he was not certain who shot him and also would have shown that Joseph had motive to shoot Georges. The state court denied Waller's ineffective assistance claim:

> Defendant asserts counsel was ineffective for failing to call Detective J.L. Overholser ("Detective Overholser") as a witness. Detective Overholser investigated Georges' shooting of Joseph on

August 26, 2013. Defendant alleges Detective Overholser would have been available to testify at trial, and he would have testified about his investigation of the shooting. He contends the testimony would have demonstrated Joseph had a motive for attacking Georges on October 13 [sic], 2013. Further, it would have contradicted Joseph's testimony that he did not know whether Georges targeted him during the August 26th shooting. Defendant claims the failure to call Detective Overholser as a witness resulted in prejudice because his testimony could have cast doubt on Defendant's guilt.

In this case, the record refutes Defendant's claim that counsel was ineffective for failing to call Detective Overholser as a witness. Defendant alleges he asked counsel to investigate Detective Overholser prior to trial, and counsel did not take any action in accordance with his request. Yet, under oath, Defendant expressed satisfaction with his counsel's performance and indicated that he did not wish to call any witnesses on his behalf. He may not now go behind his representations to this Court. See Kelley, 109 So.3d at 812.

Assuming *arguendo* counsel performed deficiently when he failed to call Detective Overholser as a witness, his actions did not prejudice Defendant. On cross-examination, counsel impeached Joseph by pointing out discrepancies in his statements about the shooter's identity during a taped police interview. The exchange is as follows:

> Q:   And they talk about the bullet being removed. And then they ask you if you [had] any idea who shot you, right?
>
> A:   Yes, sir.
>
> Q:   And you hemmed and you hawed and you said, I don't know, right?
>
> A:   Yes, sir.

Q:      And this was over two months after the time
        that you'd been shot. You got shot August 26th,
        right?

A:      Correct.

Q:      And the point they're talking to you, it's October
        18th right?

A:      Yes, sir.

Q:      So you knew at that point who shot you, right?

A:      Well, honestly, I still don't know for a fact who
        shot me, but I was told, just word of mouth from
        people, that it was him.

Defendant's counsel again referred to Joseph's familiarity with
Georges and the improbability that Joseph would not know the
identity of his shooter. Counsel emphasized Joseph knew the color
of Georges' car, the location of his apartment, and his reputation
for engaging in shootings. Consequently, Detective Overholser['s]
absence as a witness did not prejudice the defense because counsel
used other sources to impeach Joseph's credibility on the issue
identified by Defendant in the Motion. See State v. Reichmann,
777 So.2d 342, 356 (Fla. 2000) ("[F]ailing to present cumulative
impeachment evidence does not necessarily constitute ineffective
assistance.").

Further, even if Detective Overholser had testified that Georges
targeted Joseph during the shooting, his testimony would not have
removed all motives for Defendant to shoot Georges because the
State introduced evidence of a contentious relationship between
Defendant and Georges. The State called Detective Tracy Stapp,
the lead investigator of the October 13th [sic] shooting, as a
witness. He discussed security camera footage of a verbal
altercation between Defendant and Georges, and the State
submitted the video as evidence. With the introduction of evidence
tending to demonstrate Defendant's motive to harm Georges,
Detective Overholser's testimony would not have cast doubt on

23

Defendant's involvement in the attack. Accordingly, this Court
denies Ground Two.

Doc. 5-2 at 625-27 (state court's record citations omitted).

To the extent that the First DCA decided the claim on the merits, the
Court will address the claim in accordance with the deferential standard for
federal court review of state court adjudications. After a review of the record
and the applicable law, the Court concludes that the state court's adjudication
of this claim was not contrary to clearly established federal law, did not involve
an unreasonable application of clearly established federal law, and was not
based on an unreasonable determination of the facts in light of the evidence
presented in the state court proceedings. Thus, Waller is not entitled to relief
on the basis of this claim.

Nevertheless, even if the state appellate court's adjudication of the claim
is not entitled to deference, Waller's claim in Ground One, Subclaim B is
without merit. Waller asserts that he asked counsel about Detective
Overholser before trial but that counsel stated Detective Overholser was
unavailable, and points to the portion of the trial court's colloquy where he
stated that he wanted to call unavailable witnesses. But as addressed, Waller
agreed under oath that he did not want counsel to call any witnesses other
than Liston Georges. Doc. 5-1 at 1139-41. For the same reasons and based upon
the same parts of the record discussed in Ground One, Subclaim A, supra,

24

Waller cannot establish ineffective assistance based on counsel's strategic decision, to which Waller consented, not to call additional witnesses. <u>See</u> <u>Hammond</u>, 586 F.3d at 1327-28; <u>Acuna</u>, 494 F. App'x at 962-63.

In his reply, Waller raises the same argument that his use of the word "they" when responding to the trial court's question whether he wanted any more witnesses called means he was referring to more than one witness. But again, Waller did not tell the trial court that he wanted counsel to call Detective Overholser. Doc. 5-1 at 1139-41. Nor did he correct counsel's statement to the trial court that the prospective witness in question was Liston Georges. <u>Id.</u> Waller also notes that after closing arguments, he told the trial court that he wanted counsel to subpoena "[t]he detective from the incident where Herode Joseph got shot . . . ." Doc. 5-2 at 113-14. As described above, however, this statement was inconsistent with Waller's earlier sworn representation in response to the trial court's direct question whether he wanted to call any other witnesses. Doc. 5-1 at 1139-41. Waller has not shown that counsel performed deficiently in not calling Detective Overholser.

Further, Waller has not demonstrated a reasonable probability of a different outcome at trial had counsel called Detective Overholser. Even if Detective Overholser gave testimony suggesting that Joseph had motive to shoot Georges, there was also evidence of tension between Waller and Georges. Detective Tracy Stapp testified that he received information from George's co-

worker about an altercation involving Georges several days before the shooting. Doc. 5-1 at 929-30. Detective Stapp obtained surveillance video from the mall where Georges worked that showed the altercation between Georges and Waller. <u>Id.</u> at 930.

Tr'oneshia Toler, the mother of Waller's child, went to the mall with Waller and they walked by the store where Georges worked. <u>Id.</u> at 754-55. Toler testified that Waller asked Georges what time he got off, and agreed the video showed that Georges "ha[d] his arms folded, but he ha[d] his fingers in his armpit" and made a gesture "like I'm going to shoot you." <u>Id.</u> at 756, 781-82. Defense witness Detective E.M. Cayenne testified that the video might have shown Waller lifting up his shirt and acting like he had a gun and that it showed Georges "fingering as though he had a gun." <u>Id.</u> at 1125. Further, Toler testified that Georges and Waller were "beefing" for a "couple years" and that she had heard threats from Georges. <u>Id.</u> at 752. Waller also agreed in his testimony that Georges started making a shooting motion with his hand during the mall incident. <u>Id.</u> at 1170-71. Therefore, evidence established some conflict between Georges and Waller.

Additionally, counsel cross-examined Herode Joseph about whether he knew that Georges shot him in the August 2013 incident. Joseph testified that even though he initially told police he did not know who shot him, he had actually heard that it was Georges. Doc. 5-1 at 707-08. Joseph conceded that

in his deposition he had referred to being shot by Georges. Id. at 734. And Toler agreed that in her deposition, she testified that Joseph told her Georges and his brother shot him. Id. at 779. Accordingly, there was evidence from which the jury could infer Joseph's potential motive. Waller has failed to demonstrate a reasonable probability of a different outcome at trial even if additional evidence confirming this potential motive was presented through Detective Overholser's testimony.

Finally, Waller's claim is too speculative to warrant federal habeas relief because he presents no evidence that Detective Overholser would have testified as he contends. See Shaw v. United States, 729 F. App'x 757, 759 (11th Cir. 2018) ("[The Eleventh Circuit Court of Appeals has] stated that complaints about uncalled witnesses are not favored, because the presentation of testimony involves trial strategy and 'allegations of what a witness would have testified are largely speculative.'" (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978))); Streeter v. United States, 335 F. App'x 859, 864 (11th Cir. 2009) ("In a habeas petition alleging ineffective assistance of counsel, mere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." (citing Johnson, 256 F.3d at 1187)). For all of these reasons, Waller is not entitled to relief on Ground One, Subclaim B.

## B. Ground Two

As Ground Two, Waller contends that the trial court violated his federal constitutional rights by providing the jury with the principals instruction when he was not charged as a principal. Waller asserts that providing the instruction amounted to an improper constructive amendment of the indictment and turned his trial testimony into a de facto confession.

This claim is procedurally defaulted. When Waller challenged the instruction on direct appeal, he did not raise a federal issue. Doc. 5-2 at 376-82. Rather, he presented the claim as one of state law. Id. Further, he only argued that the evidence adduced at trial did not support the instruction—not that giving the instruction violated his rights by constructively amending the indictment or that it rendered his testimony a de facto confession. Id.

Waller concedes that the claim raised in Ground Two is defaulted. Reply at 10. But Waller contends that the Court may review his defaulted trial court error claim because he meets the fundamental miscarriage of justice exception. He asserts that he has presented new evidence that the jury did not hear that shows his actual innocence. By stating that the new evidence of his actual innocence is set out in Ground One, he appears to refer to the affidavit from Torrence Hayes and the potential testimony of Detective Overholser. See Reply at 11.

28

Waller has not demonstrated actual innocence for purposes of overcoming the procedural default. When considering a gateway claim of actual innocence based upon new evidence, "the habeas court's analysis is not limited to such evidence." House v. Bell, 547 U.S. 518, 537 (2006). Rather, "Schlup makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" Id. at 537-38 (quoting Schlup, 513 U.S. at 327-28). Additionally, "[a] court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of . . . evidence [of actual innocence]." Schlup, 513 U.S. at 332. But, as addressed, successful claims of actual innocence are very uncommon given the improbability that new evidence will establish a petitioner's factual innocence. See id. at 324.

The shooting occurred on October 7, 2013, in the parking lot of an apartment complex where the victims and Waller lived. Doc. 5-1 at 658, 1161. Liston Georges, Kamilah Urita, and their infant were in their parked car when Waller and Joseph pulled up in a second car. Id. at 621, 671-72, 692, 1164.

 Witness Terica Christianson saw a man standing at the open driver's side door of the victims' car. Id. at 615. She observed that he was about six feet tall and slender, had a "do-rag" on his head, and wore a black short-sleeved shirt. Id. at 615-17, 624. Christianson did not see him wearing a medical boot

or using crutches. Id. at 617. She saw the man fire a black firearm into the car before getting into the front passenger seat of the second car. Id. at 617-18. The second car drove away. Id. at 619. The man was not limping when he ran to the parked car and had no trouble moving. Id. at 618-19.

Witness Katty Morales heard gunshots and turned around to see a man get into the front passenger's side of the second car. Id. at 635-38. She believed he was wearing a black hoodie with the hood up over his head. Id. at 638. The man was not limping and was not wearing a medical boot. Id. at 638-39. Christianson and Morales approached the victims' car, where they saw that Georges was injured and Urita was non-responsive. Id. at 619-20, 641-42, 655. Urita died at the scene from multiple gunshot wounds. Id. at 872. It appears that the baby was uninjured. Id. at 620-21.

Tr'oneshia Toler testified about events before and after the shooting. She addressed the event at the mall several days prior to the shooting and stated that Waller and Georges had been "beefing" for years. Id. at 752. She also testified that she picked up Waller on the morning of October 7, 2013, and noticed a black gun in his pocket. Id. at 760. Waller told Toler that he had seen Georges and Urita at the apartment complex and that he had been watching them. Id. at 761. Toler and Waller picked up Joseph from a medical appointment, and Toler saw that Joseph was wearing a medical boot. Id. at 760. They went to Toler's aunt's house. Id. at 761-62.

Waller and Joseph left later that afternoon. Id. at 762. Toler observed Waller wearing a black shirt and Joseph wearing a white shirt. Id. at 765. Later, when Waller and Joseph returned, Waller was shirtless and Joseph wore a gray tank top. Id. at 766, 770. Toler saw Waller place a black gun wrapped up in a white shirt between the mattresses on Toler's cousin's bed. Id. at 766-69. Toler drove Waller and Joseph to Waller's aunt's house. Id. at 769-71. Toler did not see Joseph driving her car that day and believed that Waller had been driving her car. Id. at 775, 783. Toler remembered that Joseph was wearing a boot, but also stated that she had seen him walk without crutches. Id. at 776, 785.

Joseph and Waller testified to different versions of the events, and each identified the other as the shooter. Joseph stated that on the morning of the shooting, he had an x-ray on his foot, which was injured in the August 2013 shooting. Id. at 682. Joseph testified that he wore a medical boot and was on crutches. Id. at 684. As addressed, Joseph stated that he did not know who shot him but admitted that he had heard that it was Georges. Id. at 683, 707-08, 734.

Joseph testified that on the day of the shooting, he was wearing a white shirt with a gray tank top underneath. Id. at 690, 695. He and Waller went to Waller's apartment that day in Toler's car. Id. at 687-88. Joseph testified that he was driving and that he was able to do so because the boot was on his left

leg. Id. at 687-89. Joseph testified that as he waited in the car, Waller went to his apartment and returned with a bag. Id. at 690.

Joseph testified that as they were pulling away, Waller asked him to stop. Id. at 692. Joseph did so, and Waller said he had to do something. Id. at 692-93. As Waller exited the car, he pulled his black t-shirt over his head; at that time, Joseph noticed that Waller had a black gun. Id. at 692-94. Waller opened the front driver's side door of the victims' car and started shooting. Id. at 694. Waller returned to the car and Joseph drove away. Id. at 695. They went to Toler's aunt's house. Id. at 696-97.

Joseph admitted that was not initially truthful when police questioned him. Id. at 709. He changed his statements after police said they knew he was not truthful, that he had a lot to lose, that he could either be a witness or a suspect, and that he could help himself if he was a witness. Id. at 714-20. Joseph was charged with second-degree murder and attempted second-degree murder. Id. at 727. The charges were amended and Joseph pleaded guilty to accessory to murder after the fact. Id. at 700, 727-28. He testified that he had not been sentenced at the time of Waller's trial, that he could receive up to 30 years in prison, and that the State did not promise him anything in exchange for his testimony. Id. at 700-01.

When he testified, Waller admitted being present at the shooting but testified that he had no advance knowledge of it. Waller said that despite

wearing a boot, Joseph did not have trouble walking. Id. at 1154. Waller also testified that while he and Joseph were on the way to Waller's apartment that afternoon, they stopped at Joseph's house where Joseph got a black t-shirt. Id. at 1157-58. According to Waller, Joseph walked up to Waller's apartment without his crutches. Id. at 1173. Waller and Joseph were at Waller's apartment for a couple of hours. Id. at 1159. When Waller left, he saw Urita putting her baby in the car and then saw Georges. Id. at 1163-64. Waller testified that as he began to drive away, Joseph told him to hold on. Id. at 1164. Waller testified that Joseph wrapped a black t-shirt around his head and shoulders, got out of the car, went up to Georges's open car door and began shooting into the car. Id. at 1164. Waller drove them away, and wrapped the gun in a shirt and gave it to Toler to hide. Id. at 1165-68. Waller testified that the gun was Joseph's, not his. Id. at 1145-46. He also testified that he and Joseph went to Torrence Hayes's house, where Joseph incriminated himself by saying that he "had to get" Georges. Id. at 1169-70.

During his recorded police interview, Waller denied being present during the shooting and denied having a gun. Id. at 963, 971-73, 990, 1013, 1019-20. He also denied having any conflict with Georges. Id. at 966-70. When asked during his trial testimony why he did not tell police Joseph was responsible or tell police about Torrence Hayes, Waller testified that he was scared, did not want to implicate himself, and was worried about retaliation. Id. at 1179-83.

He admitted that he wiped off the gun and wrapped it in a shirt. Id. at 1198-1200. Waller testified that when he interacted with Georges at the mall, he was merely trying to clear up an "allegation" and "speculation." Id. at 1208, 1212. Waller testified that he was with Joseph during the August 2013 shooting, but he thought Georges was aiming at Joseph. Id. at 1205-07.

Physical evidence and test results were also introduced at trial. Police recovered a gun from the mattress in Toler's aunt's house Id. at 793, 941. Projectiles recovered from the scene and the Medical Examiner's office and shell casings recovered from the scene were determined to have been fired from the gun. Id. at 846-48, 942-44.

A fingerprint over the top of the front driver's side window of the victims' car matched Waller's left ring finger. Id. at 894-95, 900. A black t-shirt was found inside Toler's car. Id. at 826-27. The white shirt the gun was wrapped in contained a partial DNA profile that matched Herode Joseph. Id. at 914-15, 920-22, 945. The gun's slide had a completed DNA profile that matched Waller. Id. at 916-17, 944-45. In addition, Detective Stapp testified that he learned during his investigation that Waller was 6 feet, 1 inch tall, Joseph was about 5 feet, 8 inches tall, and they both weighed about 160 pounds. Id. at 946.

Waller called several witnesses at trial. Anzua Mason, who was at the apartment complex when the shooting occurred, testified that he heard gunshots and saw a man wearing a white shirt run across the street. Id. at

34

1086-87. Toler's cousin Mar'nae Harris testified that it was Toler who hid the gun under the mattress. <u>Id.</u> at 1103-05. Waller also called Detective E.M. Cayenne, who was present during Georges' interview and testified that Georges described the shooter as a black male not taller than 6 feet, wearing a black t-shirt, with a thin build and a mask over his face. <u>Id.</u> at 1127-28. Detective Cayenne testified that Georges did not describe the shooter as having a boot or using crutches. <u>Id.</u> at 1129. A responding officer asked Georges who shot him, but Georges only said he could not move, and did not identify the shooter. <u>Id.</u> at 671, 675-76.

When considered in the context of the overall evidence, Hayes's affidavit—executed in July 2018, four years after Waller's April 2015 conviction, by an individual who may have refused to contact Waller's counsel to participate in the trial—is insufficient to show Waller's factual innocence. Doc. 5-2 at 560; <u>see</u> <u>Schlup</u>, 513 U.S. at 332. Further, there is no evidence of what statements Detective Overholser would have made. But even if Detective Overholser stated, as Waller submits, that Georges was a suspect in the August 2013 shooting and that Joseph was the target, such evidence does not show Waller's actual innocence of the October 2013 shooting. Waller does not show that in light of the alleged new evidence, it is more likely than not that no reasonable juror would have found him guilty. <u>See</u> <u>Johnson</u>, 256 F.3d at 1171. Therefore, Waller does not establish application of the fundamental

miscarriage of justice exception to overcome the default of the claim raised in Ground Two.

But even if Waller did meet this exception, thereby entitling him to review of his trial court error claim on the merits, the claim warrants no relief. Waller argues that the instruction amounted to a constructive amendment of the indictment and turned his testimony into a de facto confession. He also asserts that the jury was confused by the instruction, as shown by a question the jury submitted during deliberations. The question read, "Does the principals clause transfer responsibility for premeditation or just the act itself?" Doc. 5-1 at 192.

Waller fails to show any federal constitutional violation in providing the principals instruction. A federal habeas court is "constrained to determine only whether the challenged instruction, viewed in the context of the entire charge and the trial record, 'so infected the entire trial that the resulting conviction violate[d] due process.'" Jamerson v. Sec'y for Dep't of Corr., 410 F.3d 682, 688 (11th Cir. 2005) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)). Waller has not met this standard.

A person is liable as a principal if he "commits . . . or aids, abets, counsels, hires, or otherwise procures [any criminal offense] to be committed." § 777.011, Fla. Stat. The jury was instructed, consistent with Florida's standard jury instructions, that:

> If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if:
>
> 1.    the defendant had a conscious intent that the criminal act be done and
>
> 2.    the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit the crime.
>
> To be a principal, the defendant does not have to be present when the crime is committed.

Doc. 5-1 at 160; <u>see</u> Fla. Std. Jury Instr. (Crim.) 3.5(a).

Counsel opposed giving the principals instruction, asserting that the evidence did not support it. Doc. 5-2 at 130-31. Counsel argued that the State's evidence supported the theory that Waller committed the offenses on his own and that the State put forth no evidence of planning or organization between Waller and Joseph. <u>Id.</u> Counsel noted that the defense evidence supported the theory that Joseph committed the offenses on his own, with no participation by Waller. <u>Id.</u>

The State countered that even if, as Waller testified, Joseph got out of the car and shot the victims, there was evidence that Waller had been watching the victims earlier in the day and supplied the car and gun. <u>Id.</u> at 131-32. The State asserted that such evidence showed Waller at least assisted in the

commission of the offenses. Id. The trial court found that there was sufficient evidence to support the principals instruction. Id. at 132.

Waller has not demonstrated a constitutional violation. Due process requires that the charging document provide a defendant with adequate notice of the charges against him. A charging document is sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117, (1974).

Waller has not shown that the State was required to charge him as a principal in the indictment to satisfy his federal due process rights. See United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) ("Aiding and abetting need not be specifically alleged in the indictment. . . ."); United States v. Walker, 621 F.2d 163, 166 (5th Cir. 1980) (stating that the trial court "did not err in giving an instruction on aiding and abetting even though the defendant was not specifically indicted on that count"); United States v. Tucker, 402 F. App'x 499, 502 (11th Cir. 2010) ("The district court did not err, plainly or otherwise, when it gave an aiding-and-abetting instruction to the jury, although such a theory of guilt was not alleged in the indictment."); Emil v. Baker, 667 F. App'x 277, 278 (9th Cir. 2016) (noting that "there is no Supreme Court precedent holding that due process requires an information to

specifically allege a theory of aiding and abetting"). In addition, in Florida, "a defendant need not be charged as a principal to support a conviction as a principal." <u>Ford v. State</u>, 306 So. 3d 417, 422 (Fla. 1st DCA 2020).

Thus, Waller fails to establish that giving the principals instruction amounted to a constructive amendment of the indictment. "A constructive amendment 'occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.'" <u>United States v. Madden</u>, 733 F.3d 1314, 1318 (11th Cir. 2013) (quoting <u>United States v. Keller</u>, 916 F.2d 628, 634 (11th Cir. 1990)). Here, consistent with the above-stated authority that aiding and abetting need not be included in the charging document, Waller fails to establish that the trial court's standard principals instruction altered any essential element of the offense. <u>See</u> <u>United States v. Thomas</u>, 631 F. App'x 847, 851 (11th Cir. 2015) (stating that "[u]nder our clear case law, the indictment was not constructively amended in violation of the Fifth Amendment when the district court gave the aiding and abetting instruction, even though aiding and abetting was not charged in the indictment" (citing <u>Martin</u>, 747 F.2d at 1407 and <u>Walker</u>, 621 F.2d at 166)).

Nor has Waller established that giving the principals instruction turned his testimony into a de facto confession. Waller admitted to driving Joseph away from the crime scene and to giving the gun to Toler to hide after the

39

shooting. Doc. 5-1 at 1164-65, 1168. But Waller testified that he did not see Joseph's gun until Joseph got out of the car, that Joseph did not say he was going to try to kill Georges, and that he had no prior knowledge of the shooting. Id. at 1176, 1178, 1186. Therefore, according to Waller's testimony, he did not intend for the crime to occur, took no action in furtherance of the crime, and only became involved after Joseph, acting on his own, committed the shooting. Thus, he did not "commit[] . . . or aid[], abet[], counsel[], hire[], or otherwise procure[] [the offense] to be committed," as required to be liable as a principal. See § 777.011, Fla. Stat.

Further, Waller's claim that the jury was confused about the instruction and improperly applied it to convict him as a principal for his actions after the shooting is entirely speculative and does not establish a constitutional violation. See Blankenship v. Hall, 542 F.3d 1253, 1270 (11th Cir. 2008) ("It is the petitioner's burden to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation."). Waller has not shown that the instruction misled the jury into believing that even if he was not the shooter, his involvement after the shooting—driving Joseph away from the scene and helping to hide the gun—was on its own sufficient to find him guilty of murder. The jury asked if the "principals clause transfer[s] responsibility for premeditation or just the act itself?" Doc. 5-1 at 192. No part of the jury's question, which indicated that they were considering the elements of first-

40

degree murder, suggested that they believed the principals instruction applied to events that only occurred after the murder.[9]

Finally, there was no error in giving the principals instruction because there was evidence to support a finding that Waller was directly responsible for the shooting. The Supreme Court has held that "it [is] no violation of due process [for a] trial court [to] instruct[ ] a jury on two different legal theories, one supported by the evidence, the other not." Sochor v. Florida, 504 U.S. 527, 538 (1992). The State presented evidence, as addressed in the discussion of the fundamental miscarriage of justice exception, from which the jury could conclude that Waller was directly responsible for the crimes.

Even besides Joseph's testimony directly implicating Waller, other evidence supported the conclusion that Waller was the shooter. Waller was seen with a black gun on the day of the shooting, and the black gun recovered from Toler's aunt's house had his DNA on it. Doc. 5-1 at 760, 916-17, 944-45. Further, his fingerprint was on the driver's side window of the victims' car, and the shooter was observed standing next to the driver's side door. Id. at 615, 894-95, 900. Waller was also seen wearing a black shirt that day, and witnesses remembered seeing the man who got into the second car wearing a black shirt

---

[9] The jury instruction for first-degree murder included the elements that (1) Urita was dead; (2) the death was caused by the criminal act of Waller; and (3) Urita's killing was premeditated. Doc. 5-1 at 157.

or hoodie. Id. at 615, 624, 638, 765. At approximately six feet, one inch tall and 160 pounds, Waller's build was consistent with Christianson's description of the shooter as about six feet tall and slender. Id. at 616-17, 946. Georges also stated that the shooter was thin. Id. at 1127-28. Further, no witness reported seeing anyone at the scene wearing a medical boot or having any trouble moving. Id. at 618-19, 638-39, 1129. But there was evidence that Joseph was in a medical boot. Id. at 760.

Accordingly, even if Waller had overcome the procedural default of the claim in Ground Two, it affords Waller no basis for relief.

## C. Ground Three

Waller argues that trial counsel was ineffective for not adequately arguing against providing the principals instruction. Waller acknowledges that the claim in Ground Three is procedurally defaulted because he did not raise it on postconviction review but argues that he is entitled to application of the cause and prejudice exception under Martinez. The Eleventh Circuit has explained the holding of Martinez as follows:

> In Martinez, the U.S. Supreme Court enunciated a narrow exception to the general rule that the lack of an attorney or attorney error in state post-conviction proceedings does not establish cause to excuse the procedural default of a substantive claim. 566 U.S. at 8, 13-14, 132 S.Ct. at 1315, 1318. The Supreme Court, however, set strict parameters on the application of this exception. It applies only where (1) state law requires a prisoner to raise ineffective-trial-counsel claims during an initial collateral proceeding and precludes those claims during direct appeal; (2) the

42

> prisoner failed to properly raise ineffective-trial-counsel claims during the initial collateral proceeding; (3) the prisoner either did not have counsel or his counsel was ineffective during those initial state collateral proceedings; and (4) failing to excuse the prisoner's procedural default would result in the loss of a "substantial" ineffective-trial-counsel claim. Id. at 14, 132 S.Ct. at 1318; see also Arthur v. Thomas, 739 F.3d 611, 629 (11th Cir. 2014) (setting forth the Martinez requirements).

Lambrix v. Sec'y, Fla. Dep't of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). A claim is substantial if it "has some merit." Martinez, 566 U.S. at 14. A claim that does not have any merit or that is wholly without factual support is not substantial. Id. at 15-16. A defaulted claim is substantial under Martinez if "reasonable jurists 'would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" Clark v. Comm'r, Ala. Dep't of Corr., 988 F.3d 1326, 1331 (11th Cir. 2021) (quoting Hittson v. GDCP Warden, 759 F.3d 1210, 1269-70 (11th Cir. 2014)).

Waller has not established that his defaulted claim of ineffective assistance of trial counsel is substantial under Martinez. Waller's counsel argued that there was insufficient evidence to support giving the principals instruction. Doc. 5-2 at 130-31. Waller asserts that instead counsel should have argued that giving the principals instruction amounted to a surprise amendment of his indictment that violated his federal right to adequate notice of the charges against him and turned his trial testimony into a de facto confession. According to Waller, if counsel had raised these arguments, the

occur and participated and assisted in the murder by providing the car. Id. Thus, the identified prosecutorial comment was premised on the State's assertion that even if Waller was not the shooter, he intended for the offense to occur and that providing the vehicle used to get to the apartment complex was an act in furtherance of its commission. Id. The prosecutor's comment, considered in context, does not suggest that Waller was liable as a principal for the charged offenses merely for driving Joseph away afterward if he had no knowledge or intent that the crime was going to happen.

Moreover, the prosecutor's comment is not the instruction to the jury. The trial court provided the principals instruction to the jury and directed the jurors that they must decide the case based upon the evidence presented during the trial and that they must follow the law as set out in the instructions. Doc. 5-1 at 160, 180. The jury is presumed to follow the trial court's instructions. See Brown v. Jones, 255 F.3d 1273, 1280 (11th Cir. 2001) ("We have stated in numerous cases . . . that jurors are presumed to follow the court's instructions."); Raulerson v. Wainwright, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are instructed.").

Having failed to establish either deficient performance or resulting prejudice, Waller has not shown that his defaulted claim of ineffective assistance of trial counsel is substantial under Martinez. Therefore, he has failed to establish that the cause and prejudice exception applies to excuse the

default of his claim. Accordingly, the claim raised in Ground Three affords Waller no basis for relief.

### D. Ground Four

As Ground Four, Waller argues that trial counsel was ineffective for failing to file a motion for arrest of judgment on the basis that the principals instruction, together with the lack of an interrogatory on the verdict form and the jury's question, created a presumption that his conviction rests on the uncharged principals theory.

Conceding that his claim is unexhausted, Waller once again argues that he meets the cause and prejudice exception under <u>Martinez</u> to excuse the default. But he has not shown that his ineffective assistance of trial counsel claim is substantial. Waller contends that counsel should have filed a motion for arrest of judgment.[10] Such a motion may be based on the contention that:

> (a) the indictment or information on which the defendant was tried is so defective that it will not support a judgment of conviction;
>
> . . .
>
> (c) the verdict is so uncertain that it does not appear therefrom that the jurors intended to convict the defendant of an offense for which the defendant could be convicted under the indictment or information; or

---

[10] Counsel filed a motion for a new trial. One of the grounds for the motion was the alleged error in giving the principals instruction. Doc. 5-1 at 201-02. The state court denied the motion without discussion. <u>Id.</u> at 213.

(d) the defendant was convicted of an offense for which the defendant could not be convicted under the indictment or information.

Fla. R. Crim. P. 3.610(a), (c)-(d).

Waller has not shown that the defaulted ineffective assistance claim is substantial. The gravamen of Waller's claim is that a motion for arrest of judgment would have provided an avenue to argue that he was convicted based on the uncharged principals theory. But for the reasons discussed in Grounds Two and Three, supra, Waller has failed to show that giving the principals instruction when he was not charged as a principal violated his rights under either state or federal law. And Waller has not shown that the indictment was deficient simply because it did not charge Waller as a principal or that giving the principals instruction resulted in a conviction that violated his rights.

Waller also has not shown, as required to prevail on a motion for arrest of judgment, that (1) the indictment was so defective that it did not support a judgment of conviction, (2) the verdict is so uncertain that it does not appear that the jurors intended to convict him for an offense for which he could be convicted under the indictment, or (3) he was convicted of an offense for which he could not have been convicted under the indictment. See Fla. R. Crim. P. 3.610(a), (c)-(d). Therefore, Waller cannot establish that counsel performed deficiently in not raising the proposed claim in motion for arrest of judgment or that he was prejudiced by counsel's action. See Hollis, 958 F.3d at 1124;

47

Pinkney, 876 F.3d at 1297. Waller therefore has not established that his defaulted claim of ineffective assistance of trial counsel is substantial under Martinez. Accordingly, he does not overcome the procedural default of the claim raised in Ground Four.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Waller seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Waller "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a

claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.      If Waller appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.      The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 18th day of August, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

TpaP-1
C:
Sayton Waller, #J55213
Counsel of record